```
                   UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT

------------------------------x
                              :
UNITED STATES OF AMERICA      :
                              :
v.                            :       Criminal No: 3:08CR26(AWT)
                              :
ROWAN LAIDLAW, KADYANN        :
BROWN, and DAVID ECCLESTON    :
                              :
------------------------------x
```

### RULING ON MOTIONS TO SUPPRESS

Defendants Rowan Laidlaw and Kadyann Brown each filed a motion to suppress. For the reasons stated herein, the motions were denied.

**A.    FINDINGS OF FACT**

On or about January 20, 2008, state law enforcement authorities in Missouri arrested an individual who was in possession of approximately 400 pounds of marijuana. The details of the arrest and surrounding circumstances were related to Connecticut-based Drug Enforcement Administration ("DEA") Special Agent Anastas Ndrenika by DEA agents based in Missouri. Ndrenika was advised that the arrested individual had agreed to cooperate with law enforcement authorities and serve as a confidential informant ("CI"). The CI indicated that she had been instructed to deliver the marijuana to an unspecified location near Exit 50 off Interstate 95, in New Haven, Connecticut.

DEA agents in Connecticut decided to attempt a controlled

delivery of the marijuana in Connecticut. For this purpose, they brought the CI and the marijuana to Connecticut, and obtained a vehicle similar to the one the CI had been operating at the time of her arrest to use in the controlled delivery.

On January 20 and 21, 2008, Ndrenika met with the CI and debriefed her in preparation for a controlled delivery. During the debriefing, the CI informed Ndrenika that she had been provided with 400 pounds of marijuana in Phoenix, Arizona by an individual she identified as Ivan Chinnery, based on a rental agreement she saw in a minivan the man had been driving.  The CI stated that this individual had directed her to deliver the marijuana to an unspecified individual at an unspecified location in Connecticut near Exit 50 off Interstate 95 in New Haven. The CI further reported that this individual had provided her with a (323) area code telephone number at which he could be contacted and that he had also provided her with a second telephone number with a Connecticut area code, (203), to which the CI was to send a text message upon her arrival in Connecticut.  The CI stated that she had been promised that she would be paid $15,000 once she delivered the marijuana.

Ndrenika searched various law enforcement data bases under the name "Ivan Chinnery," and learned that "Ivan Chinnery" was a known alias of David Eccleston.  Ndrenika knew that David Eccleston had been the target of multiple DEA investigations

throughout the United States going back to 1995, and that Eccleston had been identified as source of supply for marijuana and cocaine.  Ndrenika obtained a booking photo of David Eccleston from the Westchester County Police Department and showed it to the CI.  The CI identified the person in the photo as the individual who had provided her with the marijuana.

After debriefing the CI, Ndrenika and other members of a DEA task force supervised the CI on January 21 in an attempted controlled delivery of the 400 pounds of marijuana in the New Haven, Connecticut area.  Starting at approximately 9:13 a.m., the CI received three text messages from the (203) area code Connecticut telephone number she had been given by Eccleston.  With respect to each of these messages, a law enforcement officer was present when the message was received, and a text response was sent by a law enforcement officer.

At approximately 9:13 a.m., the CI received the following text message from the (203) area code Connecticut telephone number: "About what time you getting here?"  Exhibit C to Defendant Brown's Memorandum in Support of Motion to Suppress (Doc. No. 137) ("Ex. C") ¶ 5, at 2. A task force member responded that the CI would be arriving at lunchtime.  Approximately 10 minutes later, the CI received another text from the Connecticut telephone number: "U know where to cum, right?"  Ex. C ¶ 6, at 2.  A task force member responded, "50?"  Id.  At approximately 9:27

a.m., the CI received another text message from the Connecticut telephone number saying, "Yah call if anything," to which a task force member responded, "K. Still lunch?"  Ex. C ¶ 7, at 2.

At approximately 12:04 p.m., there was an incoming voice call to the CI from the Connecticut telephone number.  The CI was directed not to answer it, because the task force members had no information as to how the anticipated delivery was to take place.  At their direction, the CI responded by text: "C U within hour, traffic."  Ex. C ¶ 8, at 2.

At approximately 1:00 p.m. Ndrenika and other members of the DEA task force established surveillance in the area of Townsend Avenue, off Exit 50. The surveillance team consisted of approximately 12 to 15 agents and officers in six to nine vehicles, and all of the agents and officers were in radio contact with one another during the operation.  At this point, task force members were no longer physically present with the CI, but the CI had been provided with a transmitter/recorder which enabled the task force members to hear and record sound in the CI's vehicle.  At approximately 1:04 p.m., the CI received the following text message from the Connecticut telephone number: "close?"  Ex. C ¶ 11, at 3.  The CI was instructed by Ndrenika not to respond.

Then, the CI drove her vehicle north on Interstate 95, took Exit 50, turned right onto Townsend Avenue and pulled over on the southbound side of Townsend Avenue.  During this time, her vehicle

was in full view of members of the task force. When the CI arrived at this location, she sent the following text message to the Connecticut telephone number, and to Eccleston's telephone number, at the direction of task force members: "Here."  Ex. C ¶ 14, at 3.

Task force members in the area were able to view the CI's vehicle.  Task force members also saw a black Lexus and a Range Rover with New Jersey plates traveling northbound on Townsend Avenue.  Task force members saw the Lexus come to a complete stop and park directly across the street from the vehicle in which the CI was sitting.  Another task force member saw the Range Rover enter a parking lot adjacent to where the CI was located, make a u-turn and head towards the exit.  The CI reported to task force members over the transmitter: "There is a car to my left with New Jersey plates, a black male is staring at me, a female driving a Range Rover is pulling in the driveway." Ex. C ¶ 15, at 3.

After making a u-turn in the parking lot, the Range Rover turned right onto Townsend Avenue, and began to travel southbound. The CI reported to the task force members that she had received a call from the Connecticut telephone and a male caller had directed her to follow the Range Rover; task force members had been able to overhear part of this conversation.

At the direction of task force members, the CI followed the Range Rover south on Townsend Avenue.  Task force members observed the Range Rover, and then the CI's vehicle, pull over to the right

side of Townsend Avenue, and then continue south.  At this point, the Lexus remained stationary.  The Range Rover, and then the CI's vehicle, turned right onto Upson Terrace.  After that, first the Range Rover, then the CI's vehicle, stopped in the middle of Upson Terrace for no apparent reason, more than half a mile from where the Lexus was parked on Townsend Avenue.

About this time, task force members observed the Lexus make a u-turn on Townsend Avenue, proceed south, and make a right turn onto Upson Terrace.  As this happened, the Range Rover, and then the CI's vehicle, moved farther down Upson Terrace, crossed Kneeland Road, pulled over, and parked.  As the Lexus approached the two parked vehicles, task force members decided to stop it and the Range Rover.  The area of Upson Terrace where these events occurred was residential, and there was no traffic on Upson Terrace other than the Range Rover, the CI's vehicle and the Lexus, until they were joined by the task force vehicles.

At the time the task force members stopped the vehicles, they believed the Range Rover and the Lexus were being operated in tandem.  Based on their training and experience and the information available to them, they also believed that a drug transaction was about to take place.

After the vehicles were stopped, task force members wearing badges and vests identifying them as law enforcement officers approached the vehicles with weapons drawn.  The occupants of the

6

Range Rover and the Lexus were removed from their vehicles, placed under arrest, handcuffed, and read their rights from a DEA Form 13A.  The operator of the Range Rover was determined to be Kadyann Brown, and the operator of the Lexus was determined to be Rowan Laidlaw.

Having been advised of his rights, Laidlaw made no statements.  Having been advised of her rights, Brown stated that she would cooperate with the task force members, but did not have any knowledge about what had just occurred; she had merely been following her boyfriend.  Brown executed a written consent to search the premises at 675 Townsend Avenue, Unit 159, which she described as a place she leased.  Brown stated that she resided there part-time and that Laidlaw stayed there when he was in town.  At the time she provided the consent, Brown was calm and cooperative.  A search of the Range Rover yielded a box on the back seat containing $15,000.  Brown stated that she did not know the currency had been in her vehicle.  A search of the Lexus yielded a utility bill for 675 Townsend Avenue, Unit 159 in the name of Rowan Laidlaw.

**B.   DISCUSSION**

Defendant Laidlaw seeks to suppress all items seized from his person, the two vehicles, and the residence at 675 Townsend Avenue, as well as any evidence derived from the same.  Defendant Brown seeks to suppress any evidence seized from her, any

statements she made, and any evidence seized as a result of her statements and/or her consent to search.  Both defendants argue that task force members lacked probable cause to arrest them when their vehicles were stopped.

"'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'" United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008) (quoting United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990)).  "[P]robable cause is 'a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules.'"  United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).

The determination as to whether probable cause exists is "a practical, commonsense decision" whether, given the totality of the circumstances of which the officer making the determination is aware, including the veracity and basis of knowledge of persons who have supplied hearsay information to the officer, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (quoting Gates, 462 U.S. at 238).

Moreover, a probable cause determination may be based on the collective knowledge of all of the officers involved in surveillance efforts where the officers have been in communication with one another. See United States v. Cruz, 834 F.2d 47, 51 (2d Cir. 1987); see also United States v. Garcia, 413 F.3d 201 (2d Cir. 2005).

Thus, in the context of a probable cause determination, information from a confidential informant must be assessed based on an examination of the totality of the circumstances bearing upon its reliability. See Canfield, 212 F.3d at 718. The reliability of information from a confidential informant cannot be discounted solely because the informant has no track record of providing reliable information. Id. at 718(citing United States v. Wagner, 989 F.2d 69, 73 (2d Cir. 1993)). Veracity may be established in other ways. See Canfield, 212 F.3d at 718. Where a confidential informant's information "is corroborated in material respects, the [informant's] entire account may be credited, including those parts without corroboration." Id. at 719-20 (quoting Wagner, 989 F.2d at 73).

"The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Delossantos, 536 F.3d 155, 161 (2d Cir. 2008)(quoting United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)). "'[S]ome patterns of behavior which may seem innocuous enough to the

9

untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before.' As long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded." Id. (quoting United States v. Price, 599 F.2d 494, 501 (2d Cir. 1979).

Under the totality of the circumstances here, it was reasonable for the task force members to rely on the information from the CI.  The task force members were introduced to a CI who had been stopped with 400 pounds of marijuana.  From the information provided by the CI, it was determined that she had received the drugs from David Eccleston, a well-known drug dealer.  The CI told task force members about the arrangement for transporting the marijuana to the vicinity of Exit 50 off Interstate 95, in New Haven, Connecticut, and about two telephone numbers given to her by the individual who had provided her with the marijuana.  The CI had informed the task force members that she was to contact one of these numbers, a number with a (203) Connecticut area code, upon her arrival in Connecticut.

At a time consistent with the CI's report as to when she was supposed to make the delivery, task force members observed the CI begin to receive text messages from the Connecticut phone number she had been given by Eccleston to contact in connection with the delivery.  The text messages were consistent with the information

she had given to task force members, including her representation that no discussion had taken place between her and the intended recipient of the marijuana.  Because the (203) number from which the text messages the CI received was the same phone number given to the CI by Eccleston, the agents reasonably believed that the text messages were linked to the planned delivery of the marijuana.  While the defendants argue that the task force members lacked probable cause to arrest the defendants because they lacked information about the identity of the intended recipient of the marijuana, it is for precisely this reason that it was reasonable for the task force members to proceed with their investigation based on the messages to and from the phone numbers.

   Despite defendant Laidlaw's contentions to the contrary, he was sufficiently linked to the (203) phone number for the officers to have had probable cause to arrest him.  The CI told the task force members that a black male was staring at her from a car to her left and that a Range Rover with a female driver was nearby.  She then told them that a male voice had called her from the (203) phone number and told her to follow the Range Rover, which suggested that the male caller was in a location from which he could see both the CI and the Range Rover.  Based on this information from the CI and what task force members observed at the scene, it was reasonable for them to conclude at this point that the person utilizing the (203) phone number was the occupant

of the Lexus.

The CI was alone in her vehicle when she reported to task force members that she had seen the two cars and that she had received the call from the male caller telling her to follow the Range Rover.  It was reasonable for the task force members to rely on this information from the CI even though she apparently described the Lexus as a car having New Jersey license plates, when, in fact, the Range Rover had the New Jersey license plates. The task force members could see the CI and could hear what was going on in the CI's car via the transmitter, and they could see the two cars that she described.

Just after the male caller told the CI to follow the Range Rover, the Range Rover started moving as if on cue, which would suggest to a reasonable officer that the Range Rover was acting in tandem with the person making the call.  The Lexus stayed in place, which a reasonable officer could have believed was consistent with an attempt by Laidlaw to conduct counter-surveillance.

Shortly thereafter, the Range Rover, which had been traveling extremely slowly, came to a complete stop in the middle of the street.  Both the slow speed and the stop in the middle of the street, both for no apparent reason, are unusual and could have suggested to a reasonable officer an attempt at counter-surveillance by defendant Brown.  Around the same time, the Lexus,

which had been parked more than half a mile away from where the Range Rover and the CI's vehicle had stopped, made a u-turn, and traced the path that the other two cars had traveled, turning onto Upson Terrace and approaching the two stopped cars at a slow speed. The timing and manner in which the Lexus traveled to the same location as the other vehicles, like the male caller's instruction to the CI to follow the Range Rover, would suggest to a reasonable officer that the drivers of the Lexus and the Range Rover were operating in tandem.

Therefore, based on the totality of the circumstances, including the information from the CI on which the task force members reasonably relied and the task force members' own observations, probable cause existed to support the arrest of both Laidlaw and Brown at the time the task force members arrested them.

In addition, given that probable cause existed to arrest both defendants, the search of both vehicles, including their contents, was a permissible search incident to the arrests. See United States v. Ross, 456 U.S. 798, 798 & 821 (1982) (officers "may conduct a warrantless search of the vehicle that is as thorough as a magistrate could authorize a warrant" and "[a] warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search").

Finally, there remains the question of whether the written consent to search executed by defendant Brown was executed voluntarily.  Although defendant Brown argues that she "likely believ[ed]" she had no choice but to consent to the search, the record indicates that her consent was voluntarily given. Defendant Brown's Memorandum in Support of Motion to Suppress (Doc. No. 136), at 21.  "The scope of the suspect's consent is a question of fact, and '[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.'" United States v. Gandia, 424 F.3d 255, 265 (2d Cir 2005) (quoting United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir.2004)).  Although being arrested by officers who have their weapons drawn is intimidating, "the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness." United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006).  Here, the evidence shows that Brown was calm and volunteered to the task force members that she would cooperate with them.  To that end, she made statements regarding her understanding of the events that had just occurred and gave information to task force members about what they found in their search of the vehicles.  She denied knowledge of the money that was in the Range Rover and of what had just taken place.  She gave information to the task force members about

14

the 675 Townsend Avenue address before signing a consent to a search of the premises there.  Therefore, the court concludes that the government has established that Brown's consent to the search of the residence at 675 Townsend Avenue, Unit #159 was voluntarily given.

**C.   CONCLUSION**

For the reasons stated above, the Defendant's Motion to Suppress Evidence (Doc. No. 118) and the Motion to Suppress (Doc. No. 135) were DENIED.

Signed this 27th day of January, 2010 at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge